**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**MANHATTAN COURTHOUSE**

| | |
|---|---|
| Robin Weeks, individually and on behalf of all others similarly situated, | 1:22-cv-09223 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Authentic Brands Group Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.    Authentic Brands Group Inc. ("Defendant") manufactures, markets and sells white Fitted Non-Iron Stretch Supima Cotton Dress Shirts under the Brooks Brothers brand ("Product").



2.      The neck and interior tags identify the Product as "97% Supima Cotton" and "3% Lycra Spandex."

 

3.      "Cotton," from the genus *Gossypium*, refers to the part of the cotton plant that grows in the boll, the encasing for the fluffy cotton fibers.



4.      Numerous types of cotton are grown commercially worldwide, such as upland cotton, extra-long staple cotton, tree cotton and Levant cotton.[1]

---

[1] *Gossypium hirsutum*, *Gossypium barbadense*, *Gossypium arboretum* and *Gossypium herbaceum*.

5.    Different types of cotton have different characteristics, such as strength, softness, and fiber length.

6.    The main criteria to identify the type of cotton is the fiber length.

7.    The length of cotton fibers affects its qualities and price, because the longer the fiber, the stronger, softer, and more durable the resulting fabric.

8.    On the Product's listing webpage, there is a statement which emphasizes Defendant's use of American-grown Supima cotton for these very benefits.[2]

> We use American-grown Supima® cotton for its extra-long staple fibers that provide superior strength, softness, color retention, and longevity to our styles.

9.    Supima® (a trade name) cotton is a type of extra-long staple ("ELS") cotton with a range of 1.2 inches to 1.56 inches.

10.    The botanical name for Supima cotton is *Gossypium barbadense*, and its average fiber length is 1.41 inches.

11.    While it is generally grown in the United States, reports state that less than 1% of the cotton grown worldwide and less than 3% of the cotton grown in the U.S. is Supima.

12.    Since cottons with longer fibers are more expensive, there is great incentive to mix cotton byproducts and shorter fibers with higher value longer fibers.

13.    Supima cotton products are costlier than those made of shorter types of cotton.

14.    Consumers value products made from Supima cotton because they are softer and more durable than products made from non-Supima cotton.

15.    The American Society for Testing and Materials ("ASTM") developed the Single-

---

[2] https://www.brooksbrothers.com/fitted-non-iron-stretch-supima%C2%AE-cotton-dress-shirt/WV01152.html?dwvar_WV01152_Color=WHIT

Fiber Test to determine fiber lengths in finished cotton products such as sheets and clothing.[3]

16.     The Single-Fiber Test was applied on the Product. Exhibit A, TexTest Report 13467.



17.     The results revealed that (1) 70% of the fibers were shorter than 1.200 inches (30.48 mm), the low end of the range for Supima cotton, and (2) 49% of the fibers were shorter than 1.080 inches (27.432 mm).

| FIBER LENGTH AND DISTRIBUTION ASTM D 5103 | | Length Group Lower Limit (in.) | Number of Fibers | Percent of Total | |
|---|---|---|---|---|---|
| | | 2.040 | 0 | 0 | |
| | | 1.920 | 0 | 0 | |
| | | 1.800 | 0 | 0 | |
| | | 1.680 | 0 | 0 | |
| Extra Long | | 1.560 | 1 | 1 | |
| Long | | 1.440 | 6 | 6 | Probability 25% |
| Medium | | 1.320 | 9 | 9 | Supima  Cotton |
| Short | | 1.200 | 14 | 14 | |
| | | 1.080 | 21 | 21 | |
| | | 0.960 | 21 | 21 | |
| | | 0.840 | 10 | 10 | |
| | | 0.720 | 8 | 8 | |
| | | 0.600 | 8 | 8 | |
| | | 0.480 | 1 | 1 | |
| | | 0.360 | 1 | 1 | |
| | | 0.240 | 0 | 0 | |
| | | 0.120 | 0 | 0 | |
| | | 0.000 | 0 | 0 | |
| | | | 100 | 100 | |
| Total | | | | | |
| Average Length | | 1.080 " | | | |
| Standard Deviation | | 0.25 % | | | |
| Coefficient of Variation | | 0.227 % | | | |
| Maximum | | 1.629 " | | | |
| Minimum | | 0.409 " | | | |

---

[3] ASTM D5103, Standard Test Method for Length and Length Distribution of Manufactured Staple Fibers.

18.   The TexTest Report was reviewed by Dr. Sabit Adanur, a professor who specializes in textiles and has written textbooks on these subjects.

19.   Dr. Adanur concluded that even if all of the fibers were shortened by 25% during the manufacturing processes, the total number of fibers that would qualify as Supima cotton would be only 52%. Exhibit B, Adanur Report.

| | As Tested | | Prior to Manufacturing Processes |
|---|---|---|---|
| | Length Group Lower Limit (inch) | Number of Fibers | Length Group Lower Limit (inch) |
| | 2.040 | 0 | 2.720 |
| | 1.920 | 0 | 2.560 |
| | 1.800 | 0 | 2.400 |
| | 1.680 | 0 | 2.240 |
| Supima Cotton Range | 1.560 | 1 | 2.080 |
| | 1.440 | 6 | 1.920 |
| | 1.320 | 9 | 1.760 |
| | 1.200 | 14 | 1.600 |
| | 1.080 | 21 | 1.440 |
| | 0.960 | 21 | 1.280 |
| | 0.840 | 10 | 1.120 |
| | 0.720 | 8 | 0.960 |
| | 0.600 | 8 | 0.800 |
| | 0.480 | 1 | 0.640 |
| | 0.360 | 1 | 0.480 |
| | 0.240 | 0 | 0.320 |
| | 0.120 | 0 | 0.160 |
| | 0.000 | 0 | 0.000 |
| | Total: | 100 | |

20.   The 52% is arrived at by adding the number of fibers – 21 + 21 + 10 – within the

range of 1.120 inches and 1.440 inches, shown in column four.

21.    Dr. Adanur noted that this conclusion assumes that all the 10 fibers that are longer than 1.12 inches are also longer than 1.25 inches – longer than the low end of the range for Supima cotton – which is statistically improbable.

22.    Furthermore, it is understood that only the length of the cotton fibers, not the spandex fibers, was tested, so the total number of fibers which would fall under Supima cotton classification would be even lower than 52%, i.e., only 50.44%.

23.    For numerous reasons, it is unlikely the cotton fibers used in the Product were reduced in size by 25% from the time the cotton was harvested until it was analyzed.

24.    Cotton fibers can be reduced in size by ginning, a two-stage mechanical process which removes gin trash, such as stems, burrs, soil, and other debris, from the cotton bolls and separates the cotton fibers from the seed.

25.    In studies on upland cotton, the average length decrease from ginning was only 3.9%.

26.    However, upland cotton uses saw ginning, an intensive process that can be destructive to cotton fibers.

27.    In contrast, Supima cotton is processed through roller ginning, which is gentler to cotton fibers than saw ginning, and results in no meaningful shortening of the fibers.

28.    After ginning, the cotton is dyed and steamed.

29.    That this step does not have a significant impact on fiber length is shown because only one study reported that a raw stock vat-dyeing process reduced fiber length, and only by a slight amount.

30.    The final pressing of finished cotton rarely reduces the fiber length because it is done in moist conditions which reduce the brittleness of the fibers and increase their tensile strength.

31.    After the cotton is made into a finished product, the fibers can be shortened through pilling, when the fibers break, tangle and "ball up."

32.    Pilling is also more common with shorter and synthetic fibers, which is why Supima cotton, with longer fibers, is not prone to pilling.

33.    Even when manufacturers apply anti-pilling treatments to remove protruding fibers to prevent pilling, any reduction in fiber length would be *de minimis*.

34.    This is because the fiber protrusion from the fabric is usually not significant.

35.    Since Plaintiff's Product was new and unused, there could not have been shortening of the fiber lengths due to wear.

36.    Since Plaintiff's Product had not been worn or washed, the length of the fibers did not shrink.

37.    Assuming the worst-case scenario of fiber shortening such that only 52% (or only 50.44%) of the fibers qualified as Supima cotton, this is still significantly less than advertised, as the Product purports to be 97% Supima cotton (and 3% Lycra spandex).

38.    The TexTest Report supports the strong inference that the cotton used in the Product is not only Supima cotton but contains a significant amount of less expensive shorter cotton fibers and cotton byproduct fibers.

39.    The failure to disclose the presence of less Supima cotton than advertised is contrary to the Textile Fiber Products Identification Act ("Textile Act") and its regulations. 15 U.S.C. § 70, *et seq.*; 16 C.F.R. § 303.15(b).

40.    Defendant makes other representations and omissions with respect to the Product which are false and misleading.

41.    Reasonable consumers must and do rely on a company to honestly and lawfully

market and describe the quality and composition of a product, relative to itself and other comparable products or alternatives.

42.    The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

43.    Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

44.    Had Plaintiff known the truth, she would not have bought the Product or would have paid less for it.

45.    As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $118.00, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

46.    Jurisdiction is pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

47.    The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

48.    The Product has been sold at hundreds of locations and online, in the states covered by the classes Plaintiff seeks to represent, with the representations challenged here, for several years.

49.    Plaintiff Robin Weeks is a citizen of Colorado.

50.    Defendant Authentic Brands Group Inc. is a Delaware corporation with a principal place of business in New York, New York County, New York.

51.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

52.     The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here, in hundreds of locations, in the states covered by Plaintiff's proposed classes.

53.     Venue is in this District with assignment to the Manhattan Courthouse because a substantial part of the events or omissions giving rise to these claims occurred in New York County, including Defendant's decisions with respect to the labeling of the Product.

<u>Parties</u>

54.     Plaintiff Robin Weeks is a citizen of Aspen, Colorado, Pitkin County.

55.     Defendant Authentic Brands Group Inc. is a Delaware corporation with a principal place of business in New York, New York, New York County.

56.     Defendant is the owner of the Brooks Brothers brand, one of the largest sellers of clothing in America.

57.     Brooks Brothers clothing is sold to consumers from the brand's stores and outlets, third-parties such as Saks OFF 5TH and Nordstrom Rack, and online.

58.     The Brooks Brothers brand is synonymous with the highest quality, so consumers expect the products it sells to live up to their word.

59.     Plaintiff purchased the Product and/or substantially similarly represented products at locations including Brooks Brothers, 3000 E 1st Ave Ste 282, Denver, CO 80206, between 2021 and the date by which that store closed in 2022, among other times.

60.     Plaintiff believed and expected the Product contained cotton that was only Supima cotton, because that is what the representations and omissions said and implied on the Product's

9

interior tags, and the absence of any reference or statement elsewhere on the Product.

61. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, interior tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

62. Plaintiff bought the Product at or exceeding the above-referenced price.

63. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

64. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their quality and compositions.

65. Plaintiff paid more for the Product than she would have paid absent Defendant's false and misleading statements and omissions and the Product was worth less.

<u>Class Allegations</u>

66. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Colorado Class:** All persons in the State of Colorado who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Washington, New Hampshire, Virginia, Montana, Wyoming, Idaho, Alaska, Vermont, Georgia, Iowa, Minnesota, Delaware, Mississippi, Tennessee, Arkansas, South Carolina, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

67. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

68.    Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

69.    Plaintiff is an adequate representative because her interests do not conflict with other members.

70.    No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

71.    Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

72.    Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

General Business Law §§ 349 and 350

73.    Plaintiff incorporates by reference all preceding paragraphs.

74.    Plaintiff believed the Product contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

75.    Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

76.    Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

77.    Plaintiff relied on the representations and omissions to believe the Product contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

78.     Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>
<u>(Consumer Fraud Multi-State Class)</u>

79.    The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

80.    The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

81.    Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

82.    As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

83.    Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose</u>
<u>and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

84.    The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that it contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

85.    Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging and interior tags, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

86.    Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

87.     Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

88.     Defendant's representations affirmed and promised that the Product contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

89.     Defendant described the Product so Plaintiff believed it contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex, which became part of the basis of the bargain that it would conform to its affirmations and promises.

90.     Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

91.     This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company known for its high-quality products.

92.     Plaintiff recently became aware of Defendant's breach of the Product's warranties.

93.     Plaintiff provided written notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Product's warranties, sent on or before August 19, 2022.

94.     The notice was sent by First Class Mail and Certified Mail, Return Receipt Requested, was not returned to the sender, and postal records confirm it was delivered.

95.     Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

96.     The Product did not conform to its affirmations of fact and promises due to

Defendant's actions.

97.    The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container, or label, because it was marketed as if it contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

98.    The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

99.    Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

100.   Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

101.   Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

102.   Defendant knew of the issues described here yet did not address them.

103.   Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

14

<u>Unjust Enrichment</u>

104.   Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

   **WHEREFORE**, Plaintiff prays for judgment:

1.   Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.   Awarding monetary, statutory and/or punitive damages and interest;

3.   Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4.   Other and further relief as the Court deems just and proper.

Dated:   October 27, 2022

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com