UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MANHATTAN COURTHOUSE

| | |
|---|---|
| Robin Weeks, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>- against -<br><br>Authentic Brands Group Inc.,<br>                Defendant | 1:22-cv-09223-AT<br><br><br><br>First Amended<br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.     Authentic Brands Group Inc. ("Defendant") manufactures, markets and sells blouses and fitted shirts marketed as containing cotton that was only pima cotton or with a specific percentage of pima cotton under the Brooks Brothers brand ("Products").



2.     The neck and interior tags identify the Products as "97% Supima Cotton" and "3%

Lycra Spandex."[1]



3. "Cotton," from the genus *Gossypium*, refers to the part of the cotton plant that grows in the boll, the encasing for the fluffy cotton fibers.



4. Numerous types of cotton are grown commercially worldwide, such as upland cotton, extra-long staple cotton, tree cotton and Levant cotton.[2]

5. Different types of cotton have different characteristics, such as strength, softness, and fiber length.

---

[1] Supima is a trade name for pima cotton grown in the United States and may be used interchangeably here with pima.

[2] *Gossypium hirsutum*, *Gossypium barbadense*, *Gossypium arboretum* and *Gossypium herbaceum*.

6. The main criteria to identify the type of cotton is the fiber length.

7. The length of cotton fibers affects its qualities and price, because the longer the fiber, the stronger, softer, and more durable the resulting fabric.

8. On the webpage for one of the products bought by Plaintiff, the Fitted Non-Iron Stretch Supima® Cotton Dress Shirt, Defendant emphasizes its use of "American-grown Supima cotton" because "its extra-long staple fibers that provide superior strength, softness, color, retention and longevity to our styles."[3]

> We use American-grown Supima® cotton for its extra-long staple fibers that provide superior strength, softness, color retention, and longevity to our styles.

9. Supima® (a trade name) cotton is a type of extra-long staple ("ELS") cotton with a range of 1.2 inches to 1.56 inches, otherwise known as "pima cotton."

10. The botanical name for Supima cotton is *Gossypium barbadense*, and its average fiber length is 1.41 inches.

11. While it is generally grown in the United States, reports state that less than 1% of the cotton grown worldwide and less than 3% of the cotton grown in the U.S. is pima.

12. Since cottons with longer fibers are more expensive, there is great incentive to mix cotton byproducts and shorter fibers with higher value longer fibers.

13. Supima cotton products are costlier than those made of shorter types of cotton.

14. Consumers value products made from pima cotton because they are softer and more durable than products made from non-pima cotton.

15. The American Society for Testing and Materials ("ASTM") developed the Single-

---

[3] Brooks Brothers, Fitted Non-Iron Stretch Supima® Cotton Dress Shirt.

3

Fiber Test to determine fiber lengths in finished cotton products such as sheets and clothing.[4]

16. The Single-Fiber Test was applied on the Fitted Non-Iron Stretch Supima® Cotton Dress Shirt bought by Plaintiff. Exhibit A, TexTest Report 13467.



17. The results revealed that (1) 70% of the fibers were shorter than 1.200 inches (30.48 mm), the low end of the range for pima cotton, and (2) 49% of the fibers were shorter than 1.080 inches (27.432 mm).

| FIBER LENGTH AND DISTRIBUTION ASTM D 5103 | | Length Group Lower Limit (in.) | Number of Fibers | Percent of Total | |
|---|---|---|---|---|---|
| | | 2.040 | 0 | 0 | |
| | | 1.920 | 0 | 0 | |
| | | 1.800 | 0 | 0 | |
| | | 1.680 | 0 | 0 | |
| | Extra Long | 1.560 | 1 | 1 | |
| | Long | 1.440 | 6 | 6 | Probability 25% |
| | Medium | 1.320 | 9 | 9 | Supima Cotton |
| | Short | 1.200 | 14 | 14 | |
| | | 1.080 | 21 | 21 | |
| | | 0.960 | 21 | 21 | |
| | | 0.840 | 10 | 10 | |
| | | 0.720 | 8 | 8 | |
| | | 0.600 | 8 | 8 | |
| | | 0.480 | 1 | 1 | |
| | | 0.360 | 1 | 1 | |
| | | 0.240 | 0 | 0 | |
| | | 0.120 | 0 | 0 | |
| | | 0.000 | 0 | 0 | |
| | | | 100 | 100 | |
| Total | | | | | |
| Average Length | | 1.080 " | | | |
| Standard Deviation | | 0.25 % | | | |
| Coefficient of Variation | | 0.227 % | | | |
| Maximum | | 1.629 " | | | |
| Minimum | | 0.409 " | | | |

18. The TexTest Report was reviewed by Dr. Sabit Adanur, an Auburn University

---

[4] ASTM D5103, Standard Test Method for Length and Length Distribution of Manufactured Staple Fibers.

professor and recognized expert in textiles and author of academic treatises.

19.  Dr. Adanur concluded that even if all of the fibers were shortened by 25% during the manufacturing processes, the total number of fibers that would qualify as Supima cotton would be only 52%. Exhibit B, Adanur Report.

|  | As Tested | | Prior to Manufacturing Processes |
|---|---|---|---|
|  | Length Group Lower Limit (inch) | Number of Fibers | Length Group Lower Limit (inch) |
|  | 2.040 | 0 | 2.720 |
|  | 1.920 | 0 | 2.560 |
|  | 1.800 | 0 | 2.400 |
|  | 1.680 | 0 | 2.240 |
| Supima Cotton Range | 1.560 | 1 | 2.080 |
|  | 1.440 | 6 | 1.920 |
|  | 1.320 | 9 | 1.760 |
|  | 1.200 | 14 | 1.600 |
|  | 1.080 | 21 | 1.440 |
|  | 0.960 | 21 | 1.280 |
|  | 0.840 | 10 | 1.120 |
|  | 0.720 | 8 | 0.960 |
|  | 0.600 | 8 | 0.800 |
|  | 0.480 | 1 | 0.640 |
|  | 0.360 | 1 | 0.480 |
|  | 0.240 | 0 | 0.320 |
|  | 0.120 | 0 | 0.160 |
|  | 0.000 | 0 | 0.000 |
|  | Total: | 100 | |

20.  The 52% is arrived at by adding the number of fibers – 21 + 21 + 10 – within the range of 1.120 inches and 1.440 inches, shown in column four.

21. Dr. Adanur noted that this conclusion assumes that all the 10 fibers that are longer than 1.12 inches are also longer than 1.25 inches – longer than the low end of the range for Supima cotton – which is statistically improbable.

22. Furthermore, it is understood that only the length of the cotton fibers, not the spandex fibers, was tested, so the total number of fibers which would fall under Supima cotton classification would be even lower than 52%, i.e., only 50.44%.

23. For numerous reasons, it is unlikely the cotton fibers used in the Product were reduced in size by 25% from the time the cotton was harvested until it was analyzed.

24. Cotton fibers can be reduced in size by ginning, a two-stage mechanical process which removes gin trash, such as stems, burrs, soil, and other debris, from the cotton bolls and separates the cotton fibers from the seed.

25. In studies on upland cotton, the average length decrease from ginning was only 3.9%.

26. However, upland cotton uses saw ginning, an intensive process that can be destructive to cotton fibers.

27. In contrast, Supima cotton is processed through roller ginning, which is gentler to cotton fibers than saw ginning, and results in no meaningful shortening of the fibers.

28. After ginning, the cotton is dyed and steamed.

29. That this step does not have a significant impact on fiber length is shown because only one study reported that a raw stock vat-dyeing process reduced fiber length, and only by a slight amount.

30. The final pressing of finished cotton rarely reduces the fiber length because it is done in moist conditions which reduce the brittleness of the fibers and increase their tensile strength.

31. After the cotton is made into a finished product, the fibers can be shortened through

pilling, when the fibers break, tangle and "ball up."

32. Pilling is also more common with shorter and synthetic fibers, which is why Supima cotton, with longer fibers, is not prone to pilling.

33. Even when manufacturers apply anti-pilling treatments to remove protruding fibers to prevent pilling, any reduction in fiber length would be *de minimis*.

34. This is because the fiber protrusion from the fabric is usually not significant.

35. Since Plaintiff's Product was new and unused, there could not have been shortening of the fiber lengths due to wear.

36. Since Plaintiff's Product had not been worn or washed, the length of the fibers did not shrink.

37. Assuming the worst-case scenario of fiber shortening such that only 52% (or only 50.44%) of the fibers qualified as Supima cotton, this is still significantly less than advertised, as the Product purports to be 97% Supima cotton (and 3% Lycra spandex).

38. The TexTest Report supports the strong inference that the cotton used in the Product is not only Supima cotton but contains a significant amount of less expensive shorter cotton fibers and cotton byproduct fibers.

39. The failure to disclose the presence of less Supima cotton than advertised is contrary to the Textile Fiber Products Identification Act ("Textile Act") and its regulations. 15 U.S.C. § 70, *et seq.*; 16 C.F.R. § 303.15(b).

40. For years, the Federal Trade Commission ("FTC") has cracked down on the advertising and labeling of cotton products, enforcing the Textile Act and Rules.

41. The FTC emphasizes that if companies "advertise or sell clothing or household items

7

containing cotton, the product labels must reflect the fabric content accurately."[5]

42. Furthermore, while "[a] fiber content statement may include the name of a type of cotton, the cotton trademark or a term that implies the presence of a type of cotton[, t]he statement must be truthful and not deceptive."[6]

## Jurisdiction and Venue

43. Jurisdiction is pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

44. The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

45. Plaintiff is a citizen of Colorado.

46. Defendant is citizen of Delaware and New York.

47. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen.

48. The members of the class Plaintiff seeks to represent are more than 100, because the Products have been sold with the representations described here, in hundreds of locations, in the states covered by Plaintiff's proposed classes.

49. Venue is in this District with assignment to the Manhattan Courthouse because a substantial part of the events or omissions giving rise to these claims occurred in New York County, including Defendant's decisions with respect to the labeling of the Products.

## Parties

50. Plaintiff Robin Weeks is a citizen of Aspen, Colorado, Pitkin County.

---

[5] Federal Trade Commission, *Calling It Cotton: Labeling and Advertising Cotton Products* (2014).
[6] *Id.*

51. Defendant Authentic Brands Group Inc. is a Delaware corporation with a principal place of business in New York, New York, New York County.

52. Defendant owns and operates the Brooks Brothers brand, one of the oldest, most distinguished and largest sellers of clothing in America and the world.

53. Brooks Brothers clothing is sold to consumers from the brand's stores and outlets, third-parties such as Saks OFF 5TH and Nordstrom Rack, and online.

54. The Brooks Brothers brand is synonymous with integrity the highest quality, so consumers expect their products live up to their word.

55. As a result of the false and misleading representations, the Products are sold at a premium price, approximately no less than $118.00, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

56. Plaintiff has purchased multiple garments from Brooks Brothers during the relevant statutes of limitations which were advertised as having a specific percentage of pima cotton.

57. Plaintiff values the classic elegance of the Brooks Brothers brand and its commitment to quality, without cutting corners.

58. Plaintiff bought the Product at Brooks Brothers stores such as the one located at 1st Ave in Denver, Colorado, between 2021 and the date by which that store closed in 2022, among other times.

59. Plaintiff purchased other Brooks Brothers clothes represented as containing a specific amount of pima cotton at the Denver store and/or other Brooks Brothers locations in the United States.

60. Plaintiff believed and expected these Products contained the amount of pima cotton

9

advertised and not a significant percentage less.

61. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, interior tags, and/or images on the Products, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Products and separately, through in-store, digital, audio, and print marketing.

62. The value of the Products that Plaintiff purchased was materially less than its value as represented by Defendant.

63. Defendant sold more of the Products and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

64. Had Plaintiff known the truth, she would not have bought Brooks Brothers clothing advertised as containing a specific percentage of pima cotton or would have paid less for it.

65. Plaintiff paid more for Brooks Brothers clothing advertised as containing a specific percentage of pima cotton than she otherwise would have paid.

66. Plaintiff bought the Product analyzed by TexTest and Dr. Adenur and other Brooks Brothers items marketed as containing a specific percentage of pima cotton for not less than the above-referenced price.

67. Plaintiff chose between Defendant's Products and products represented similarly, but which did not misrepresent their quality and compositions.

Class Allegations

68. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Colorado Class:** All persons in the State of Colorado who purchased Brooks Brothers blouses and shirts marketed as containing a specific amount of pima cotton during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Montana, Wyoming, Idaho, Alaska, Iowa, Arkansas and Utah who purchased Brooks Brothers blouses and shirts marketed as containing a specific amount of pima cotton during the statutes of limitations for each cause of action alleged.

69. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

70. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

71. Plaintiff is an adequate representative because her interests do not conflict with other members.

72. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

73. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

74. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

<u>New York General Business Law ("GBL") §§ 349 and 350 and</u>
<u>Colorado Consumer Protection Act,</u>
<u>Colo. Rev. Stats. §§ 6-1-101, et seq. ("CCPA"),</u>
<u>(Colorado Class)</u>

75. Plaintiff incorporates by reference all preceding paragraphs.

76. The CCPA and GBL were adopted by the legislatures of Colorado and New York to protect consumers against deceptive acts.

77. The GBL and CCPA consider it a deceptive trade practice when a company, like Defendant, among other things, (1) knowingly or recklessly makes a false representation as to the characteristics of goods, such as the amount and proportion of pima cotton, (2) represents that goods are of a particular standard, quality, or grade, if they know or should know that they are of another, and (3) advertises goods with intent not to sell them as advertised.

78. The CCPA encompasses the direct marketing of the Products to Plaintiff and other Colorado residents because they viewed and relied on the representations about the amount and type of cotton in Colorado.

79. Defendant's marketing of its pima cotton blouses and shirts as containing a specific percentage of pima cotton is subject to the GBL for numerous reasons.

80. First, Defendant's published terms of use requires that disputes related to any issues, including those of customers, be brought in courts in New York County.

81. Second, Defendant requires that any notices sent by customers be sent to "c/o Authentic Brands Group, LLC, 1411 Broadway, 21st Floor New York, NY 10018."

82. Third, Defendant's terms of use mandate the application of New York law as covering any disputes brought by customers or other parties.

83. Fourth, Defendant relies on New York for its creative and design team that runs the Brooks Brothers brand.

12

84. This is demonstrated by its recent Initial Public Offering ("IPO") prospectus, where it noted how "Competition for qualified personnel is intense, particularly in New York, where our headquarters are located, and competitors may use aggressive tactics to recruit our key employees."

85. Fifth, Defendant is located in New York to take advantage of this State's highly specialized knowledge in the area of textiles, home of the Garment District.

86. The decision to market the Products as containing a specific amount of pima cotton was made in New York in part due to New York's historical and current connection to the textile industry.

87. Sixth, Defendant relies on its New York location because of this State's center as a capital investment center.

88. In fact, its IPO sheet disclosed that "the address of all listed stockholders is" at its New York headquarters.

89. The location of Defendant's investors, including "funds and accounts, [and] such affiliates and such portfolio managers and/or investment committee members" is less than a mile from its headquarters at 55 East 52nd Street, New York, New York 10055, making it easy to receive additional monies to operate Brooks Brothers.

90. The underwriting for Defendant's IPO occurred in New York, due to the availability of capital needed to fund its growing operations.

91. Defendant's auditing firm for the past ten years is also based in New York, owing to this State's respected standards for accounting practices, which ensure Defendant can access capital to fund Brooks Brothers.

92. One of Defendant's main subsidiaries, Authentic Brands Group LLC, is a partnership

that complies with the laws of the City of New York by filing Unincorporated Business Tax ("UBT") Returns, based on net income.

93. These and other publicly filed financial documents indicate that payments for inventory and operations of the Brooks Brothers brand are disbursed from New York.

94. All income and revenue from the Brooks Brothers operations are received directly in New York, even though Brooks Brothers operates throughout the United States and the world.

95. Plaintiff believed the Products contained cotton that was only Supima cotton and that where they indicated a specific percentage of pima cotton, they either contained that percentage and not a significant percentage less.

96. Plaintiff relied on the labeling and marketing of the Products.

97. Representing the Products as containing a specific amount of pima cotton when that amount is significantly less is a practice harmful to the public of Colorado and New York.

98. Defendant's false, misleading, and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

99. Defendant misrepresented the Products through statements, omissions, ambiguities, half-truths and/or actions.

100. Plaintiff relied on the representations and omissions to believe the Products contained cotton that was only Supima cotton, because the interior tags said 97% Supima cotton and 3% Lycra spandex.

101. Plaintiff would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts
(Consumer Fraud Multi-State Class)

102. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are

similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

103. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

104. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

105. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

106. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

107. The Products were manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff that they contained cotton that was only Supima cotton, because the interior tags and other representations said so.

108. Defendant directly marketed the Products to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging and interior tags, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

109. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

110. Defendant's representations about the Products were conveyed in writing and promised they would be defect-free, and Plaintiff understood this meant that it contained specific

amounts of cotton that was only Supima cotton, known for its comfort, durability, softness and quality.

111. Defendant's representations affirmed and promised that the Products contained cotton that was only Supima cotton or an amount of pima cotton, when this was false.

112. Defendant described the Products so Plaintiff believed they contained cotton that was only Supima cotton or a specific amount and percentage of pima cotton, which became part of the basis of the bargain that they would conform to their affirmations and promises.

113. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

114. This duty is based on Defendant's outsized role in the market for this type of Products, a trusted company known for its high-quality clothing and a reputation for integrity.

115. Plaintiff recently became aware of Defendant's breach of the Products' warranties.

116. Plaintiff provided written notices to Defendant, its agents, representatives, retailers, and their employees that it breached the Products' warranties, sent on or before August 19, 2022.

117. The notices were sent in August 2022 to BB OpCo LLC, the holding company owned by Defendant and SPARC Group BB Holdings, LLC through a partnership where Defendant manages and owns the Brooks Brothers brand while SPARC focuses on the store locations.

118. The notices were sent by First Class Mail and Certified Mail, Return Receipt Requested to the official addresses of BB OpCo LLC in New Jersey and Delaware, and were not returned to sender.

119. The notices were confirmed by the U.S. Postal Service as being delivered with confirmation numbers 9214 8901 4298 0472 3430 33 and 9214 8901 4298 0472 3430 40.

120. The notices included a letter summarizing the breaches of the relevant warranties, a

draft complaint and the two exhibits that were filed with the Complaint.

121. Defendant failed to respond to the notices and after roughly three months without hearing from Defendant, it was clear to Plaintiff that Defendant did not intend to cure the breach of the Products' warranties.

122. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

123. The Products did not conform to their affirmations of fact and promises due to Defendant's actions.

124. The Products were not merchantable because they were not fit to pass in the trade as advertised, not fit for the ordinary purpose for which they were intended and did not conform to the promises or affirmations of fact made on their packaging and labeling, because they were marketed as if they contained either cotton that was only Supima cotton or a specific percentage of pima cotton.

125. The Products were not merchantable because Defendant had reason to know the particular purpose for which the Products were bought by Plaintiff, because she expected it contained either cotton that was only Supima cotton or a specific percentage of pima cotton, and she relied on Defendant's skill and judgment to select or furnish such suitable products.

126. Plaintiff would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Fraud

127. Defendant misrepresented and/or omitted the attributes and qualities of the Products, that it contained either cotton that was only Supima cotton or a specific percentage of pima cotton.

128. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

129. Defendant knew of the issues described here yet did not address them.

130. Defendant's fraudulent intent is evinced by its knowledge that the Products was not consistent with its representations.

## Unjust Enrichment

131. Defendant obtained benefits and monies because the Products were not represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary, statutory and/or punitive damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated: May 9, 2023

Respectfully submitted,

/s/ Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080

spencer@spencersheehan.com

19